**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**WILLARD J. MCCULLEN,**

      **Plaintiff,**

**vs.**                                          **Case No.  4:11-CV-00343-CAS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


**<u>MEMORANDUM OPINION</u>**

      This is a social security case referred to me upon consent of the parties and

reference by District Judge Stephan P. Mickle.  Doc. 9.  It is concluded that the decision

of the Commissioner should be affirmed.

**Procedural status of the case**

      Plaintiff, Willard J. McCullen, has applied for disability insurance benefits and

supplemental security income benefits.  His insured status for disability benefits ends

December 31, 2012.  Plaintiff alleges disability due to severe impairments, with onset on

September 10, 2007.  Plaintiff was 45 years of age on September 10, 2007, has an

eighth grade education, and has past relevant work as a heavy equipment mechanic.

      On February 20, 2004, Plaintiff filed applications for a period of disability,

disability insurance benefits, and supplemental security income alleging disability as of

August 14, 2003.  These claims were denied initially and upon reconsideration, an

Administrative Law Judge's (ALJ) decision dated August 16, 2007, found Plaintiff disabled beginning on August 14, 2003, and ending on January 6, 2006.  Benefits were awarded from August 14, 2003, through January 6, 2006, based on the prior application filed on February 20, 2004.  Dissatisfied with this closed period of disability, Plaintiff filed a request for review and on November 20, 2007, Plaintiff's request was denied by the Appeals Council.  R. 24, 127-44.  (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)

On October 1, 2007, Plaintiff filed an application for a period of disability and disability insurance benefits, which was denied initially on May 6, 2008.

On November 17, 2008, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning September 10, 2007.  The claim was denied initially on April 9, 2009, and upon reconsideration on June 23, 2009.  Thereafter, Plaintiff filed a written request for a hearing on June 30, 2009, and appeared with counsel and testified at a hearing held on August 12, 2010, in Tallahassee, Florida.

The ALJ found that the Plaintiff met the insured status requirements of the Social Security Act (Act) through December 31, 2012.  R. 26.

Under step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since September 10, 2007, the alleged onset date.  *Id.*

The ALJ found under step two that Plaintiff has severe impairments "because they are more than minimal limitations on [Plaintiff's] ability to perform basic work."  R. 27.  The severe impairments include: "a history of low back pain/lumbar degenerative disc disease; neck pain/history of cervical spinal stenosis, s/p diskectomy and fusion;

bilateral knee pain; history of bilateral medical meniscus tear, s/p arthroscopic surgery on both knees and an adjustment disorder with depressed mood (20 CFR 404.1520(c)." *Id.*

Under step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." In so concluding, the ALJ gave "little weight to the opinions of Drs. Botwin and Derasari that the claimant's back impairment meets/equals Listing 1.04 (Exhibits 22F and 24F)." R. 27. *See, e.g.,* pp. 18-20, *infra.*

Under step four, the ALJ found that Plaintiff "is unable to perform any past relevant work (20 CFR 404.1565)." R. 37.

The ALJ also concluded that "[a]fter careful consideration of the entire record," that Plaintiff "has the residual functional capacity [RFC] to perform a restricted range of light work," *id.*, and thus is not disabled. *Id.*, at 28-37.

Under step five, the ALJ concluded that "[c]onsidering claimant's age, education, work experience and [RFC], there are jobs in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a))." R. 37-38.

On October 18, 2010, the ALJ entered his decision determining that Plaintiff "is not disabled under Sections 216 (i) and 223(d) of the Social Security Act." Doc. 13-2, 24-39.

On January 27, 2011, Plaintiff's current counsel filed a letter in support of the Request for Review previously filed. R. 327-29. On April 14, 2011, the Appeals Council

of the Social Security Administration denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner and is the subject of this appeal.

Plaintiff and Defendant have filed memoranda of law supporting their positions. Docs. 17 and 20.

Plaintiff maintains that the ALJ's decision is not supported by substantial evidence of record and that the ALJ erred in rejecting the treating physician's opinions, and finding Plaintiff not credible.  Further, Plaintiff claims that the ALJ's evaluation of Plaintiff's impairments and illiteracy was erroneous and resulted in harmful error.

**Issues to be determined**

Whether the ALJ erroneously rejected the opinions of Plaintiff's treating physicians Drs. Kenneth Botwin and Manjul Derasari; whether the ALJ's credibility determination of Plaintiff is supported by substantial evidence; and ultimately, whether the ALJs final administrative decision that Plaintiff is not disabled is supported by substantial evidence and premised upon correct legal principles?

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002)(citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  However, if the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips v. Barnhart, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e), & (g).

If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d at 841, and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks

persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d at 583, *citing* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing. MacGregor, 786 F.2d at 1053; Marbury, 957 F.2d at 841.

Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988). After considering a claimant's complaints of plain, an ALJ may reject them as not credible. *See* Marbury, 957 F.2d at 839, citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)). If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* Wilson, 284 F.3d 1225. Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true. *Id.*

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See also* 20 C.F.R § 404.1529 explaining how symptoms and pain are evaluated; 20 C.F.R. § 1545(e) regarding RFC, total limiting effects. This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.  Who else is better able to determine the existence of an underlying medical condition that can reasonably be expected to give rise to the claimed pain than the treating physician?  That is why it is so well-established that the treating physician's opinion as to the existence and effects of pain must be given substantial weight.  *See, e.g.*, Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1217 (11th Cir. 1991) (finding that the opinion of the treating physician that the claimant suffers from disabling pain must be accepted as true).

The reasons articulated by the ALJ for disregarding the claimant's subjective testimony must be based upon substantial evidence.  Jones v. Dep't of Health & Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-54 (11th Cir. 1986).

Case No. 4:11cv343-CAS

It is true that an ALJ may credit subjective pain testimony even if objective evidence is lacking.  But this is merely permissive guidance.  It does not mandate belief in the subjective testimony where the substantial evidence in the record indicates otherwise.  After all, in making the credibility finding, the ALJ is directed to articulate the findings based upon substantial evidence.  Substantial evidence may consist of objective medical findings, a lack of other objective medical findings, evidence of exaggeration, inconsistencies in activities of daily living, failure to pursue recommended physical therapy or to take prescribed medications, and the like.

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).

"Where proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  *Id.* at 1562, *quoting* Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

### Evidence from the administrative hearing

**Plaintiff (Willard J. McCullen)**

Plaintiff testified during the evidentiary hearing.  R. 86-110.  *See also* R. at 59-62, 114-16.

Plaintiff has an eighth grade education and no vocational, technical schooling, or college.  *Id.*, at 86.  He cannot read or spell.  He has never read a newspaper.  *Id.*, at 106-07.  He was "turned" down by the armed forces.  *Id.*, at 87.

As of the hearing date of August 12, 2010, Plaintiff's last worked (prior to September 10, 2006) as a "heavy equipment mechanic," with "Gulf Agriculture At the Mines" for approximately four years.  *Id.*  He worked on his feet most of the day-standing or walking.  *Id.*, at 87-88.  He would typically lift "[w]renches, 25 pounds, 10 pounds, 15 pounds."  *Id.*, at 88.  His prior employment of ten years involved substantially the same type of work.  *Id.*  From approximately 1987 through 2003, Plaintiff worked 12 hours a day, seven days a week, as a diesel mechanic in a steel yard, making $18 an hour.  *Id.*, at 113-14.

On or about September 10, 2006, Plaintiff sustained an injury and thereafter performed light-duty work, *e,g.,* cleaning the scale and rinsing the loaders, *id.*, at 92, and was paid a full salary until September 10, 2007.  During this one year period, Plaintiff could not go "up in the tower" or "squat."  *Id.*, at 89-90.  Some days he worked an eight-hour day and on others he went home because he could not do the work.  *Id.*, at 91.  Plaintiff clarified that toward the end of 2006, he "just cleaned everything.  That's all [he] did."  *Id.*, at 115.  According to Plaintiff, this work was mostly a light job.  *Id.*, at 116.  He did no lifting every day or carrying.  *Id.*, at 115.  He was let go from his employment on or about September 10, 2007.  It was unsafe for Plaintiff to be at work and that was a problem for the employer.  *Id.*, at 116.

Since September 10, 2007, Plaintiff has used his savings to support himself.  *Id.*, at 93.

Plaintiff states that he cannot function anymore the way he used to.  His head spins when he takes medication.  He "can't think, [he] can't function any more the way [he] used to."  *Id.*, at 94.  He told his doctor that he "can't remember things.  That's [his] biggest problem."  *Id.*

At the time of hearing, Plaintiff was taking Darvocet, Lipitor, Lortab, Lorica, and Xanax "and some other stuff" prescribed by Dr. Cromer, a primary care physician, who Plaintiff has seen during the "last couple of months" prior to the hearing.  *Id.*, at 94-95.

Drs. Botwin, Webb, and Derasari were no longer helping him.  *Id.*  "[N]o one's helping [him].  *Id.*, at 95.  Plaintiff states that he told these doctors that "[he] couldn't remember things" and that "sometimes things don't make sense."  Plaintiff does not think these doctors changed his medications in response to his complaint.  *Id.*, at 96.  He has difficulty concentrating, *i.e.*, his mind starts wondering.  *Id.*, at 107-08.

Plaintiff could not remember if he had seen a mental health professional for mental problems since September 10, 2007.  *Id.*, at 96.  *See* R. 459-62, exhibit 10F, March 13, 2009, psychological evaluation (Dr. Mussenden).

Plaintiff never claimed that he was unable to return to work as a heavy equipment mechanic due to mental issues as result of his injuries sustained in 2003 and 2006.  *Id.*, at 96-97.  Rather, he was unable to work primarily because of physical limitations.  *Id.*, at 97.

Plaintiff was vague describing when he first noticed his memory failing.  *Id.*, at 97-98.

Plaintiff was asked whether he could work, *e.g.*, at the cinema as a ticket-taker without any lifting and Plaintiff said he "could do it for a little while" as long as it did not

involve reading.  *Id.*, at 98-99.  He felt he could not perform this task on a continuous basis because of "the problem of remembering things and [his] head is spinning and things like that."  He has similar problems when driving, although he drives to the grocery store, but does not drive frequently.  *Id.*, at 100.  In order to attend the hearing, Plaintiff drove from St. Petersburg to Tallahassee in about eight hours, taking a stretch break due to numbness in his legs.  He drives to Tampa to visit family approximately every third month and stays for a couple of months.  *Id.*, at 104-06.

Currently, Plaintiff watches television (although he frequently asks his brother questions because he cannot remember things), spends time with his father and one of his brothers, "take[s] a lot of showers," and sits.  *Id.*, at 101.

He normally sits in one position for about 10 to 15 minutes before he starts hurting.  If he were home, he would place an ice bag on his neck.  *Id.*, at 110.

He is able to function now because he is taking prescribed medicine, currently Lortab 10, four times a day.  He has been taking pain medication for a very long time.  *Id.*, at 102, 108.  He is also taking an antidepressant prescribed by Dr. Cromer, and previously by Dr. Derasari, and medication for migraine headaches and high blood pressure.  *Id.*, at 108.

Plaintiff is single and lives in his trailer.  His brother does most of the cooking at their father's house.  He does not belong to any clubs.  *Id.*, at 103.

Plaintiff explained his pain as going "from [his] spine all the way up to the top of [his] head is pain.  And both [his] knees and [his] lower legs [frequently] go numb," "numb right now."  *Id.*, at 107.

Plaintiff's worker's compensation claim was settled within several months prior to the hearing, resulting in a lump sum settlement of $23,500 and $11,750 for future medical expenses. *Id.*, at 60-61. *See also* R. 325. After his claim was settled, Plaintiff has continued to see doctors, *e.g.*, Dr. Cromer, for pain management. *Id.*, at 62.

In response to questions from the ALJ, Plaintiff did not remember having a functional capacity evaluation conducted by a physical therapist, although he recalled having physical therapy. *Id.*, at 61-62.

**Robert Bradley (vocational expert)**

Robert Bradley reviewed the vocational aspects of Plaintiff's case. He did not provide any vocational services to Plaintiff. *Id.*, at 110-11. He was present and heard Plaintiff's testimony. *Id.*, at 113.

The regional economy for Tallahassee is the State of Florida.

Mr. Bradley was asked to assume the following facts:

Q  Okay, let's assume a 49-year-old individual, oh, let's see, 48 years old, a younger person, a limited education, the past work experience that you've denoted, assume that I find from the documentary proves the following: during the course of an eight-hour workday, this hypothetical person can sit, stand, and walk for at least six hours or more in an eight-hour day, lift 20 pounds occasionally up to one-third of the workday and 10 pounds or less more frequently up to two-thirds of the workday. Within those weight limitations, he can operate foot pedal, arm and hand controls without limitation. You were present during Dr. Hancock's testimony, Mr. Bradley? R. 116-17.

Mr. Bradley was present during Dr. Hancock's testimony and heard all the other limitations that Dr. Hancock offered in response to the RFC evaluation that the ALJ had reviewed with him. Mr. Bradley was asked to assume the following additional facts:

Q  Assume I also accept all those other limitations as defined by Dr. Hancock. Also assume that I find that from a mental standpoint with regard to his ability to understand, remember, carry out, and make judgments on simple rogue, repetitive-type work tasks, the claimant has no problem, no limitation function,

assume with regard to his ability to understand, remember, carry out and make judgments on more complex or detailed instructions a moderate impairment, with moderate being defined as more than a slight limitation function with the ability to still undertake these activities in a satisfactory manner.  I find no limitation with regard to his ability to interact with members of the general public, co-workers supervisors, or to make adjustments in a normal routine work setting.  Within these limitations and no others, would he be able to return to his past relevant work, either as he performed it or as it's customarily performed?  R. 117-18.

After considering these factors, Mr. Bradley responded "no," opining that Plaintiff would not be able to return to his past relevant work.  *Id.*, at 118.

However, Mr. Bradley also stated that Plaintiff could perform other light and sedentary work (without reading) such as a ticket-taker, with approximately 2,500 positions in Florida; or dining room attendant, with approximately 2,500 positions in Florida; housekeeper, with approximately 25,000 positions in Florida; or laundry press operator, with approximately 1,200 positions in Florida.  *Id.*, at 118-19.  These are unskilled positions that are generally learned within 30 days and generally characterized as requiring repetitive tasks.  *Id.*, at 119-20.  No meaningful reading is required for these positions.  *Id.*  (Mr. Bradley provided DOT numbers for each line of work.  *Id.*)

At this point, Plaintiff's counsel asked Mr. Bradley the following hypothetical:

Q  Mr. Bradley, I would like to pose a hypothetical based upon the opinions expressed by Dr. Botwin and approved by both Dr. Webb and Dr. Derasari, and that would be as referenced in Exhibit 22F [R. 606-07], and that would be as follows: I want you to assume that the claimant, based upon the combination of his cervical and lumbar spine injuries, is limited to no more than sitting, standing, walking one hour in an eight-hour day each, that he is limited to no more than lifting or carrying greater than 10 pounds and never above that, that he is unable to use either upper extremity for pushing or pulling, that he is never able to squat, kneel, crawl, or reach above shoulder level, and that he is able to only occasionally bend.  I would like you to further assume that based upon the opinions expressed by Dr. Conger in Exhibit 13F [R. 485-88], that the claimant is moderately limited in terms of the ability to maintain concentration for extended periods and that he is moderately limited in terms of the ability to complete a normal workday and work week without interruption from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number

and length of rest periods, moderate, being defined as an impairment would seriously interferes with any combination with one or more other restrictions assessed may preclude the individual's ability to perform the designated work on a regular and sustained basis, i.e., eight hours per day, five days per week, or an equivalent work schedule.  Based upon the hypothetical, would that eliminate the claimant's ability to perform, not only his past relevant work, but the other jobs that you just identified in response to the judges hypothetical?

Mr. Bradley responded "[y]es," which would eliminate the Plaintiff's ability to perform any other jobs in the national economy.  R. 120-21.

Mr. Bradley was also asked to assume that "[I]f [he] took all of the original restrictions that were contained in the [ALJ's] initial hypothetical but simply imposed the restriction of no bending more than occasionally, what affect would that have on the ability to perform the work that [Mr. Bradley] referenced in response to the [ALJ's] initial hypothetical."  Mr. Bradley opined that this restriction would probably preclude Plaintiff from performing these jobs, except ticket-taker, because those jobs involve "frequent bending."  *Id.*, at 121-22.

However, Plaintiff could perform a full range of sedentary, unskilled work - "200 approximately DOT sedentary unskilled job titles, and [Mr. Bradley] wouldn't eliminate any of them" based on the hypothetical posed by Plaintiff's counsel.  *Id.*, at 122-23.

Mr. Bradley clarified somewhat that some of the unskilled, sedentary jobs would be eliminated based on an inability to read or bend (approximately 30 percent) the highest number based on an inability to read. *Id.*, at 123.  Plaintiff's inability to read would not, according to Mr. Bradley, eliminate Plaintiff from working as a housekeeper or laundry press operator.  *Id.*

**Dr. Charles Hancock (medical expert)**

Dr. Hancock is a board-certified orthopedist residing in Thomasville, Georgia, and testified by telephone.  R. 47, 49.  Prior to hearing, Dr. Hancock did not afford any medical services to Plaintiff or render a medical opinion in this matter.  *Id.*, at 51. Dr. Hancock was designated by the Commissioner to offer a medical opinion in this case and testified at the hearing as an impartial medical expert.  *Id.*

Dr. Hancock reviewed Plaintiff's medical records from the onset date (September 10, 2007) and described Plaintiff's medical difficulties from an orthopedic perspective and pointed out inconsistencies or conflicts.  *Id.*, at 52-63.

When Dr. Hancock practiced, more often than not, he performed the functional capacity evaluation, "because unless you know the person doing the functional capacity evaluation, they [are] almost worthless."  *Id.*, at 83.  He opined that it is more reasonable for a physician to assign his or her own restrictions rather than relying upon the results of a functional capacity evaluation.  *Id.*  He also credited the unique perspective of the treating physician regarding assigning restrictions that a functional capacity evaluator would not have.  *Id.*  He also agreed that Drs. Webb, Botwin, and Derasari, as Plaintiff's treating physicians, would be in a better position to evaluate restrictions on Plaintiff than him, although he did not know "whether they exercised their position or not."  *Id.*, at 84. Dr. Hancock agreed with the ALJ's statement "that the functional limitations have to bear some rationale [sic] relationship to the objective findings that are in the record, no matter whether those be called [sic] from both clinical exams or the diagnostic studies, such as MRIs, CT scans, myelograms, and the like."  *Id.*, at 85.

The ALJ asked Dr. Hancock if he saw "any inconsistencies, conflicts, or contradictions regarding a medical diagnosis or opinion offered with respect to [Plaintiff's] orthopedic-related complaints." *Id.*, at 51-52.

Dr. Hancock believed there was "a little confusion in the record as to the cause of his spinal injury." *Id.*, at 52.  For Dr. Hancock, there is no "question that [Plaintiff] had a significant injury to his cervical spine with severe quadriparesis [quadriplegia, with the loss of the use of his upper and lower extremities to some extent], and for that, he had a[n] anterior cervical disc infusion at two levels.  There was a question into how that happened. . . .[Plaintiff] indicated that he had fallen off a piece of heavy equipment, another indicated at another type of injury, and [he] was not sure what happened." *Id.*

Dr. Hancock noted that after Plaintiff had "the anterior depression and disc infusion at two levels, he showed some improvement that potentially the result would be lasting.  And then the condition began to reoccur, and additional decompression posteriorly this instrumentation and infusion.  And although he improved, he never completely overcoming [sic] and had some residual discomfort in his upper and lower extremities" *Id*.  Dr. Hancock made other observations regarding some of the medical records.  *Id.*, at 53-59.  In part, he had "[n]o doubt [Plaintiff] has some significant impairment," although he stated he could not improve on the agency RFCs report- "2010, lift, carry sit—sit/stand and walk." *Id.*, at 54.

Dr. Hancock  referred to a November 19, 2009, neurological exam, exhibit 20F, page 2, noting what he believed to be some findings, *e.g.*, motor strength 5/5, sensory normal throughout lower extremity, and negative straight leg raise, exhibit 20F, page 2, R. 574, in conflict with Plaintiff's reported pain.  R. 62-63.

The ALJ referred Dr. Hancock to exhibit 21F, page 2, dated February 2, 2009, and reported that Dr. Derasari had released Plaintiff saying that he was at maximum medical improvement (MMI) as of February 2, 2009.[2]

During Dr. Hancock's testimony, and in reference to Plaintiff's functional capacity, Plaintiff's counsel advised that Dr. Webb, an orthopedist, deferred to his partner's (Dr. Botwin) assessment of Plaintiff's functional capacity in exhibit 22F, R. 606-07, and that Dr. Derasari, a pain management physician, also deferred to Dr. Botwin regarding the assignment of restrictions.  *Id.*, at 64.  At this point in the hearing, the ALJ stated:

> ALJ:  Yeah, but Dr. Botwin, unfortunately, offered no rationale for the conclusions that he offered in that exhibit. I see nothing here, no medical rationale whatsoever to support the degree of limitations that are in Exhibit 22F.  There's just a bunch of things circled here without no [sic] explanation at all as to how he reached these conclusions.  This is unacceptable.  This doesn't comport with our regulations.  There has to be some – and – there has to be something in light of the many normal neurologic exams that were conducted regarding this claimant, one would be hesitant to accept that the degree of functional loss noted by this particular doctor would be reasonable in light of those normal neurologic exams. I mean, and these are normal neurologic exams that are interspersed quite regularly throughout the file, including exams by the pain management doctor Dr. Derasari [phonetic].  So I'm not quite sure that this check-off form, in and of itself, constitutes substantial evidence of anything without some medical rationale, and I'll ask Dr. Hancock.

R. 64-65.

Dr. Hancock reviewed Dr. Botwin's opinion in exhibit 22F, R. 606-07, and stated, in part, with respect to Plaintiff's reported ability to lift: "Now, even a one-armed individual is supposedly able to lift 20 pounds and [INAUDIBLE] at a [INAUDIBLE] somebody with an amputation [INAUDIBLE] more than 20 pounds.  But it says he can

---

[2] Under physician remarks, Dr. Derasari referred the reader to his office note of February 2, 2009, R. 585, in part, deferring "the restriction and rating would be done by the orthopedic or it was done as per the orthopedic and spine surgeon."  R. 585.

only go to seven to 20.  And he's got both upper extremities [INAUDIBLE] for what he [sic] really capable of doing."  R. 65-66.

The ALJ then reviewed part of Dr. Botwin's functional assessment with Dr. Hancock questioning, *e.g.*, the connection between Dr. Botwin's assessment that Plaintiff can never squat, kneel, crawl or reach above shoulder level, but that he could occasionally bend "1-33% of [a] day," which, according to the ALJ, meant that if a person can bend while seated, then they "have to be seated at least about two and a half hours or a little more.  And if they were standing, they could have – they would have to stand and walk in order to bend more than what he says [Plaintiff] can do.  So that's internally inconsistent there.  And he says he thinks he has a condition that equals 1.04. He doesn't specify what subsection. . . . "  *Id.*, at 66-67.  Dr. Hancock agreed with the ALJ that he was unable to discern any rationale that is supported by objective medical evidence that would support any of the limitations offered by Dr. Botwin.  *Id.*, at 67.

Dr. Hancock reviewed exhibit 23F, R. at 617-18, an August 8, 2009, MRI of Plaintiff's lumbar spine without contrast, and opined that he did not see anything "real significant there."  *Id.*, at 66-68.  (The impression in this report was: "Borderline or equivocal bulge of the L4-5 disk and slight bulge of the L1-2 disc and perhaps some mild lateral bulging of the L2-3 disc.  No frank disc herniation is identified.  The thecal sac is at the lower limits of normal throughout the lumbar levels, which is presumably a congenital finding."  *Id.*, at 617.)  In response, Dr. Hancock stated, that in his opinion, the only way Dr. Botwin could render his opinion regarding Plaintiff's severe functional limitations as expressed in exhibit 22F was on the basis of Plaintiff's subjective complaints that he hurts.  *Id.*, at 68.

The ALJ discusses other findings of Dr. Botwin with Dr. Hancock, none of which are significant or reasonable to Dr. Hancock.  *Id.*, at 69-72.

Dr. Webb, a spinal surgeon, conducted a physical exam of Plaintiff on August 25, 2009, *id.*, at 577-78.  The ALJ referred Dr. Hancock to the neurologic and musculoskeletal portion of Dr. Webb's evaluation on page 6 of 11.  *Id.*, at 74-75. Dr. Hancock stated that the findings were similar to Dr. Botwin – "[a]bout as normal as you can get."  *Id.*, at 75.

On June 5, 2009, Dr. James Patty, a non-examining state agency doctor, performed a physical residual functional capacity assessment for Plaintiff.  R. 477-83, exhibit 12F, which was discussed with Dr. Hancock.  *Id.*, at 76-77.  As characterized by the ALJ, "Dr. Patty suggests that residual functional capacity indicating an ability to lift 20 pounds occasionally, up to one-third of the day, and 10 pounds or less more frequently, up to two-thirds of the day, with the ability to sit, stand, and walk for at least six hours or more in an eight-hour day, and the ability to use their upper and lower extremities for the operation of arm, hand, foot, and pedal controls unlimited within those weight limitations."  *Id.*, at 76.  Dr. Hancock expressed no disagreement.  *Id.* Regarding postural activities, Dr. Hancock only disagreed with Dr. Patty's assessment regarding Plaintiff's ability regarding climbing and would put ropes, ladders, and scaffolds in the "never" column.  *Id.*, at 76-77, 479.  He agreed that Plaintiff should avoid working where vibration exists and working in unprotected heights.  Dr. Hancock had no other disagreements with Dr. Patty's assessment, *id.*, at 77, although he added that Plaintiff should not work above his head.  *Id.* at 79-80.  As noted above, *supra* at 16-17, Dr. Hancock commented on exhibit 22f and other exhibits.

Dr. Hancock agreed that Plaintiff had a very significant surgery to his cervical spine in 2003, 2004.  Dr. Hancock was aware of the knee surgeries performed in 2007 and 2008, but he felt the injuries were not "that severe" such that the procedures would affect Plaintiff's ability to climb in terms of ramps and stairs.  *Id.*, at 79-80.

**Medical evidence**

Evidence that Pre-Dates September 10, 2007 (Onset Date)

Plaintiff was injured on August 14, 2003, in a workplace accident, requiring a surgical removal (on September 11, 2003) of imbedded metal in the chest and left arm. R. 504.  However, Plaintiff's C4-5 and C5-6 discs protruded and encroached on the spinal cord.  R. 503-08.  On October 22, 2003, Plaintiff underwent an anterior cervical diskectomy at C5-6 and C6-7 with plate fixation at C5 to C7 with a post-operative diagnosis: cervical disc herniation with myelopathy, relatively acute at C5-6.  R. 338, 512.

After an initial improvement, in January 2004, Plaintiff reported a worsening of symptoms and stabilization of pain at the base of the neck.  Although Plaintiff's myelopathic symptoms were not expected to resolve completely, it was not anticipated they would worsen.  Upon examination, rapid alternating movements of the hands were slightly slowed but grip strength was normal, and there was a trace Hoffmann's sign in the left hand, but not the right with reports of decreased sensation to pinprick.  R. 333-40.

On February 18, 2004, Plaintiff underwent a posterior cervical laminectomy at C4 through C6 inclusive with posterior spinal fusion of C3-C7 due to congenital cervical spinal stenosis.  R. 509-11.

In August 2006, a bilateral knee MRI examination identified moderate degenerative changes and inflammation.  R. 364-75.  On September 10, 2006, Plaintiff injured both knees at work falling off a crushing machine, and received treatment at the Tallahassee Orthopedic Clinic for knee pain.  R. 359, 362-84, 409.  He was diagnosed with a right knee osteoarthritis with medial meniscal tear, right knee chondromalacia, and left knee chondromalacia.  R. 364.  Plaintiff continued limited work until September 10, 2007.  R. 89-90, 115-16.

Evidence that Post-Dates September 10, 2007 (Onset Date)

On September 14, 2007, Plaintiff was evaluated by pain management specialist Jeff Myers, M.D.  Plaintiff described having "centralized neck pain along with right versus left arm discomfort, described as some radiating pain down to his forearms."  He also described "centralized low back pain with radiation to both legs down to his heels and toes" and "having bilateral knee pain" despite recently taking Lortab, and Soma, which afforded no relief.  R. 350.

A musculoskeletal physical examination revealed that Plaintiff's "[m]otor strength appeared to be 5/5 in the upper and lower extremities."  R. 350.  "Deep tendon reflexes were 2+ in the upper and lower extremities and " symmetrical.  There was "a posterior cervical and anterior cervical scar noted."  Dr. Myers could not reproduce any pain to palpitation.  There was some low back pain with movement of Plaintiff's low back; "however, no trigger points or muscle spasms were noted.  Facet loading was done with no reproduction of pain.  Straight leg raising was negative."  Dr. Myers diagnosed "[c]ervicalgia, status post anterior and posterior cervical fusion" and "[l]ow back pain with radiation.  Etiology unknown."  R. 350-51.

A CT scan of Plaintiff's neck was requested, although it was noted that the test "will probably show us minimal results, but since he has metal in his neck an MRI would be out of the question."  R. 351.  *See* p. 24, *infra*, regarding the CT scan.  Since Plaintiff's physician had retired, Dr. Myers suggested that Plaintiff find a primary care physician to manage his pain needs and overall medical health.  *Id*.

On September 21, 2007, Plaintiff first received treatment with Uchenna Emenike, M.D., and presented for preventive physical examination and to establish care.  R. 519.  A neck exam revealed "no abnormalities."  Musculoskeletal exam revealed a normal gait and station.  Inspection and palpitation of the bones, joints, and muscles were unremarkable.  The neurologic/ psychiatric exam revealed that Plaintiff was oriented times three with appropriate mood and affect.  "Touch, [pain], vibratory, and proprioception sensations are normal.  Deep tendon reflexes [were] normal." Dr. Emenike's impression after a general medical examination was low back pain, upper back pain, and bilateral knee pain.  Plaintiff's prescription for Lortab for pain control was re-filled.  R. 520.

During a follow-up visit with Dr. Uchenna Emenike on September 26, 2007, pain management issues were discussed and Dr. Emenike "reiterated the need to maintain one primary physician as the prescriber of his pain medication."  Plaintiff was informed that he would be discharged "from the practice should he seek pain medications from elsewhere."  R. 539-40.  *See also* R. 541-42, 567-68 for an October 24, 2007, follow-up visit with Dr. Uchenna Emenike.

On October 12, 2007, a CT scan of Plaintiff's cervical spine was performed without contrast.  The impression was: "Status post extensive cervical fusion with

hardware both anteriorly and posteriorly and multilevel laminectomies. . . .  Mild straightening of the cervical lordotic curvature.  Mild bilateral foraminal narrowing of C7-T1."  R. 517.

On November 26, 2007, Plaintiff was examined by Dr. Mignon Emenike.  R. 543-44.  Plaintiff reported "seeing pain management but he states that they are doing nothing."  He reports "worsening signs of anxiety and thinks he needs to get back on a regular medicine."  *Id.*  (Plaintiff continued to see Dr. Mignon Emenike for medication management through July 2008, and received prescriptions for Lortab, Celebrex, Xanax, and Zoloft for depression.  R. 527-70.   *See also* R. 541-70 for examination notes for 11/26/07; 12/27/07; 1/30/08; 4/08/08; 5/5/08; 6/10/08; and 7/24/08.)

During a follow-up visit with Dr. Mignon Emenike on February 28, 2008, it was noted that Plaintiff continued to miss appointments with Dr. Khanna.  Plaintiff reported seeing Dr. Peterson "in ortho and recently had knee surgery."  Plaintiff continued reporting significant pain.  R. 531, 550.  The noted impression, "done by aw," was low back pain, bilateral knee pain, and essential hypertension.  The notes indicate that Dr. Emenike's office would "contact Dr. Peterson and Dr. [Thornberry] to see if [the Plaintiff] has received pain medication from other physicians" and that Plaintiff was again informed "that if he was found to have other pain medications filled by other practitioners that he will be discharged from this practice."  *Id.*, at 531-32, 551.

In November 2007, Dr. Loeb examined Plaintiff's right knee.  R. 384.  Plaintiff reported injuring both knees on September 10, 2006.  *Id.*

On December 19, 2007, Plaintiff underwent a right knee arthroscopy for a medial and lateral meniscal tear with chondral damage and early degenerative changes.

However, the degenerative changes resulting in spurring were not remedied in the surgery and deemed to be preexisting.  R. 381-82, 393-95.  Post-surgically, Plaintiff continued to have "a little bit of patellofemoral crepitus" of the right knee in January 2008.  Plaintiff's right knee was reported as "doing fairly well," although he was "having some mild soreness."  R. 380.

On January 23, 2008, Plaintiff underwent arthroscopic surgery (by Dr. Loeb) of the left knee due to a medial meniscal tear and chondral damage.  R. 378-79, 390-91.

In February 2008, Plaintiff underwent a neurological evaluation for memory loss and confusion since the accident.  He was instructed to get a brain MRI and a dementia workup; however, this testing was never performed.  R. 523-24.

On March 25, 2008, Plaintiff was evaluated by Wayne Sampson, M.D., at the Commissioner's request.  Plaintiff complained "of constant, sharp lower back pain and neck pain since a work related injury 7-8 years ago."  R. 352.  "He also reports persistent bilateral knee pain that limits standing to 10-15 minutes at a time.  He is not able to kneel or stoop or squat repeatedly.  He is able to do light work around his home."  R 352.  Upon examination, Plaintiff was reported as "fully oriented, and in no acute distress."  His mood was "within normal limits."  Plaintiff  "was able to get up from a seated position without difficulty.  He was able to get on and off the exam table without difficulty.  He was able to bend over and take off and replace his shoes; including laces."  The extremities had no clubbing, cyanosis, or edema and motor strength was 5/5 throughout, including hand grip.  Plaintiff walked with a slight limp; however, he was able to stand and walk on his heels and toes.  His neck and back were non-tender with no spasms.  Straight leg raise exam was negative bilaterally.  There

was diffuse swelling of the knees with pain on full extension; however, there was no heat, erythema, or tenderness.  No medical records were reviewed; however, Dr. Sampson's diagnosis was chronic neck/lower back pain; neuropathy, peripheral; arthropathy of the knees; and depression.  R. 354.

On April 11, 2008, Plaintiff was evaluated by psychologist Marie Hume Guilford, Ph.D., at the Commissioner's request.  R. 358-61. "No medical or psychiatric documents were available for review at the time of this evaluation."  R. 361.  Plaintiff reported experiencing depression since he got hurt and was currently taking Zoloft.  "He was able to walk but did so stiffly and as if he were in pain."  He reported problems with his memory, although Dr. Guilford reported that "his recent and remote memory abilities were generally intact.  He demonstrated good recall of the sequences of events and specific details of his history."  His judgment and insight were "[w]ithin normal limits." He had adequate communication and social skills.

Regarding functional ability, Dr. Guilford noted that Plaintiff's "problems do not significantly impair his ability to follow simple one or two-step instructions.  Nor do they significantly affect his ability to interact with others.  He is able to maintain attention, concentration, and pace.  He is having difficulty dealing with stress lately." R. 360.

Plaintiff was noted to be "a few days off on the date…almost showed up a day early for his appointment because he got confused about the day of the week" and appeared to be "stressed out and anxious" and "on the verge of a panic attack."  Plaintiff confirmed that he had panic attacks sometimes, and was observed to be "taking deep breaths, putting his head down and putting his hand on his head."  He also "frequently

started rambling about if they would just 'fix him' he would go back to work." R. 361.

Plaintiff was diagnosed with "Major Depressive Disorder, NOS" and "Panic Disorder without Agoraphobia" and a guarded prognosis. R. 361.

A June 2, 2008, a lumber spine (without contrast) MRI identified a disc herniation with annular tear at L1-2 with mild central canal stenosis, a bulging disc at L3-4 abutting the thecal sac with mild canal stenosis, and a bulging disc at L4-5 abutting the thecal sac with mild facet and ligamentum flavum hypertrophy bilaterally. R. 571-72.

On June 10, 2008, as noted above, Plaintiff was seen by Dr. Mignon Emenike for a follow-up visit. R. 557-58. A gait and station examination performed by Dr. Emenike revealed "midposition without abnormalities." "Inspection and palpation of bones, joints and muscles is unremarkable." R. 558. Dr. Emenike's impression was depression, essential hypertension, and erectile dysfunction. *Id*.

On June 11, 2008, Plaintiff had a follow–up examination with Dr. R. Spencer Stoetzel after Plaintiff's recent lumbar MRI, which "demonstrates multi-level degenerative disc disease with a small central herniation at L1-2 without significant nerve root compression." R. 387. The exam indicated that Plaintiff was "ambulating with difficulties" and had "4-5/5 motor in his lower extremities." *Id*. Dr. Stoetzel recommended "non-operative treatment."

Another follow-up exam occurred on July 24, 2008, with the same recommendation. R. 386. Dr. Stoetzel stated that if pain management did not have anything to offer Plaintiff, he would be considered at MMI. He indicated he would "recommend a transfer of care over to pain management." *Id*. Plaintiff was discharged to pain management due to no surgical options being available with a diagnosis of low

back pain, multilevel degenerative disc disease, small disc herniation at L1-2, but not the cause of symptoms.  *Id.*

In 2008 and 2009, Plaintiff received general care and medication for back pain through Family Care associates.  He was noted, in part, to have chronic neck, back, and knee pain.  R. 397- 408.

On November 13, 2008, Plaintiff was first evaluated by pain management physician Manjul D. Derasari, M.D., through the workers' compensation insurer (Zenith).  R. 409.   (Dr. Derasari is board certified in anesthesiology.  R. 31.))

Plaintiff complained of throbbing, aching, sharp type of pain associated with shocks sometimes going down the leg and numbness.  When asked about numbness, he said it is in his fingers as well as in his feet on and off.  When he walks, his pain gets worse especially more in the knee and then in the back with activity.  He says nothing helps his pain.  He cannot walk.  He cannot bend and he said he cannot run.  At night it hurts him and his sleep is disturbed.  His pain is reported as 8/10.  He said since his injury, his pain is not getting better.  R. 410.  Plaintiff reported taking Lortab 10 mg up to three times a day and that "[i]t works and it allows him to remain functional.  He has taken it on and off."  *Id.*   Plaintiff's past surgical history was reviewed as well as the medical records of Drs. Smith, Loeb, Stoetzel, and Chaumont.  *Id.* at 411.

Dr. Derasari began his "HEENT" examination notes with "[u]nremarkable," R. 411, and stated:

> Neck: There is stiffness.  The patient has well healed scar of surgery anteriorly and posteriorly in the neck and his restriction of motion is there but there is no myofascial tenderness, no nerve root tenderness, no thyromegaly, and no neck vein distention.  Good strength in the upper extremity.  Lumbar spine, I do not find any specific trigger point or tenderness in the L4-L5 region, no tenderness in the sacroiliac region, no sciatic notch tenderness, no trochanteric tenderness.

Hip rotation is unremarkable.  Knee jerks are 1+ on both sides.  Ankle is difficult to elicit.  The patient has good strength.  No calf tenderness.  No pedal edema. On the left posterior knee there is definite swelling which is not soft but somewhat firm but not hard, suggestive of popliteal cyst.  There is crepitus and restriction of movement and there is some hamstring tightness.  Bladder and bowels are voluntary.

Dr. Derasari diagnosed lumbar degenerative disc disease with a herniated disc and lumbar radicular pain, chronic with mild stenosis; and bilateral knee pain secondary to advanced degenerative disc disease following aggravation via an industrial accident. Dr. Derasari noted that Plaintiff "was positive for opiate and oxycodone" and negative for other substances.  Plaintiff admitted "that he has taken medication oxycodone from his friend."  Dr. Derasari prescribed Lorcet three times daily.  Dr. Derarsari noted that Plaintiff's orthopedist gave him an MMI impairment rating from the knee perspective, but no rating was given for the lumbar spine. R. 409-12, 416.

Dr. Derasari met with Plaintiff on December 16, 2008, "for his leg and neck pain, and knee pain" and discussed the status of his workers compensation case.  "Reported pain is 7-8/10."  Plaintiff was prescribed Lorcet and Soma.  R. 415-16.

In January 2009, Dr. Derasari increased Plaintiff's pain medication dosage, and requested authorization for pain control injection for Plaintiff's knees due to severe pain and significant limitations with activities such as getting up from bed.  R. 417-19.

On February 2, 2009, Dr. Derasari stated that Plaintiff had reached MMI, "but the restriction rating would be done by the orthopedic or it was done as per the orthopedic and spine surgeon."  Lorcet and Soma were prescribed.  "Reported pain is 10/10." R. 436.

On February 12, 2009, Dr. Derasari provided pain injections for both knees.  He noted Plaintiff had an injection previous to his knee surgery, but his pain has increased. R. 437.

On February 17, 2009, Dr. Edward Holifield, a non-examining State agency physician, opined that Plaintiff could perform light exertional activity with occasional postural limitations.  R. 451-58.

During a follow-up visit with Dr. Derasari on March 3, 2009, Plaintiff reported pain of 8/10, although the injection had helped him significantly between the lower back and knee.  Lorcet and other pain medication were reviewed.   R. 440.  *See also* R. 445, when Plaintiff reported the same degree of pain, but Dr. Derasari noted that Plaintiff is out of Naprosyn, Soma, and Lorcet after 20 days.

Dr. Derasari assigned a 3% rating for the lower back for workers' compensation purposes.  R. 440.  He noted Plaintiff was applying for Social Security Disability "because of his lower back and the knee injury combined."  R. 440.  However, on March 23, 2009, he also noted Plaintiff was using too much of his medication and needed better accountability.  R. 445.

On March 13, 2009, Plaintiff was evaluated by Gerald Mussenden, Ph.D., at the Commissioner's request.  He was noted to be depressed and anxious and preoccupied with pain and having some difficulties trying to focus and concentrate, and difficulties persisting with different tasks.  A chronic pain disorder with depression was diagnosed; neck, back, leg, and knee injury/problem noted; and a global assessment of functioning (GAF) (based on mental health adjustment) score of 60 was offered "[d]ue to difficulties relating and interacting in a constructive manner due to preoccupation with chronic

pain."  Dr. Mussenden recommended that Plaintiff "[s]hould be involved with rehabilitation and appropriate pain medications," with a fair prognosis.  R. 459-62.  (The ALJ noted: "per DSM – IV, Axis, a GAF from 51-60 represents moderate symptoms OR moderate difficulties in one of the following; social, occupational or school functioning."  R. 32.)

On April 1, 2009, Plaintiff reported to Dr. Derasari that his primary pain concern was his knee pain, right greater than left, and his secondary pain concern was the lower back.  For workers' compensation purposes, the orthopedics gave Plaintiff a 3% rating on the left knee and 4% rating on the right knee was assigned.  From a low back perspective, Dr. Derasari gave him a 3% rating.  R. 448, 591.  Plaintiff was limited to no frequent bending or lifting and carrying up to 20 pounds.  R. 448, 450.  Lorcet, Soma, and Naprosyn were prescribed for the month and Plaintiff was told to "slowly cut down the medications, especially the narcotics."  *Id.*, at 448.

On April 7, 2009, James Mendelson, Ph.D, a non-examining State agency psychologist, deemed Plaintiff's mental impairment not severe.  R. 463.

On May 5, 2009, Dr. Derasari noted that Plaintiff could lift/carry up to 20 pounds.  R. 450.  *See also* R. 591 for additional office notes for May 5, 2009.  On June 5, 2009, Dr. Derasari reported that from his perspective and Plaintiff's "pain perspective, he remains on chronic opiod analgesic therapy and the medication he takes is allowing him to remain functional.  His accountability is remaining good."  R. 592.

On June 5, 2009, Dr. James Patty, a second non-examining Stage agency physician, opined Plaintiff was capable of light exertional activity.  R. 477-84.  *See also* R. 451-58 for  Dr. Holifield's (medical consultant) assessment.

On June 22, 2009, Thomas Conger, Ph.D., a second non-examining State agency psychologist, opined that Plaintiff had moderate limitations in his abilities to maintain attention and concentration for extended periods of time and to complete a normal workweek and workday, but was capable of routine tasks.  R. 485-87.

During a July 9, 2009, visit with Dr. Derasari, Plaintiff reported "[h]his main pain is in the lower back and then knee."  R. 593.  He discussed, in part, Plaintiff's "medication issue, tolerance issue, addiction issue, and abuse issue" with Plaintiff and he was continued on Soma, Percocet, and Ibuprofen on as needed basis.  *Id.*

On August 7, 2009, Plaintiff was seen by Dr. Derasari, who notified Plaintiff that he was taking too much medication and obtaining it from more than one physician. Dr. Derasari reviewed Plaintiff's medication record and warned him that he could lose his workers' compensation coverage.  Plaintiff was also advised about addiction to pain medication and further that before Dr. Derasari did anything further, urine drug testing would be performed.  At this point, Plaintiff left the office and went to his lawyer. Dr. Derasari's impression is the "possibility of drug addiction" and recommended urine drug testing and referral to an addiction specialist.  R. 594-96.  After Plaintiff and Dr. Derasari conferenced with the workers' compensation attorney, Dr. Derasari continued pain management treatment for Plaintiff.  R. 597-98.

On August 25, 2009, Plaintiff's workers' compensation insurer sent him to Scott Webb, D.O. (Florida Spine Institute) for evaluation of ongoing low back pain.  Plaintiff reported having difficulty finding a comfortable position, and was noted to have limited and painful range of motion.  Examination revealed, in part, that Plaintiff's motor strength was 5/5 throughout his lower extremity; "normal gait and station and normal

posture;" "[s]ensory normal throughout lower extremity;" no tenderness on the lumbosacral, but "[f]lexion restricted and painful and [e]tension restricted and painful;" "[s]traight leg raise negative;" and the hips had no pain and full range of motion. Dr. Webb placed Plaintiff on temporary total disability with a lumbar degenerative disc disease diagnosis.  R. 577-78, 582-83.

An August 28, 2009, a lumbar spine MRI identified borderline or equivocal bulging of the L4-5 and a slight bulge of the L1-2 disks with some possible bulging of the L2-3. "No frank herniation is indentified" and the "thecal sac at the lower limits of normal throughout the lumbar spine, which is presumably a congenital finding."  R. 617.  *See also R. 575.*

On September 2, October 2, October 28, November 23, December 23, 2009, and January 25, 2010, Plaintiff had office visits with Dr. Derasari, in general to discuss his pain and use of medications.  R. 599-603.

On September 3, 2009, during a follow-up visit with Dr. Webb, Plaintiff's work status was noted to be "off duty per physician."  R. 575.  Dr. Webb's diagnosis was displacement of the lumbar intervertebral disc without myelopathy; degeneration of the lumbar or lumbosacral intervertebral disc; spinal stenosis of lumbar region; and thoracic or lumbosacral neuritis or radiculitis.  *Id.*, at 576.  Dr. Webb proceeded with a CT myelogram of the lumbar spine for a further evaluation of Plaintiff's leg pain.

On September 14, 2009, Kenneth Botwin, M.D., evaluated Plaintiff at Dr. Webb's request for a *new* patient consultation for neck and arm pain.  R. 613.  (Dr. Botwin is board certified in Pain Medicine and Physical Rehabilitation at the Florida Spine Institute.  R. 33.)  The examination was essentially normal (normal gait, station, and

posture; motor strength 5/5 throughout lower extremity) except for trigger points, muscle spasm, and limited range of motion.  R. 614.  Dr. Botwin's diagnosis was displacement of the lumbar intervertebral disc without myelopathy; thoracic or lumbosacral neuritis; or radiculitis; spinal stenosis of the lumbar region; degeneration of the lumbar or lumbosacral intervertebral disc; muscle spasm; s/p cervical fusion anterior and posterior fusion; spinal enthesopathy; and postprocedural arthrodesis status.  Dr. Botwin recommended a lumbar contour LSO back brace as well as a TENS unit.  He further opined Plaintiff was unable to work.  Dr. Botwin noted that Plaintiff was seeking a new pain management physician instead of Dr. Derasari, as he was not being provided with spinal injections or any therapy for his back surgery, and was recommending such procedures.  R. 615.

On September 16, 2009, Plaintiff had a follow-up visit with Dr. Botwin for an EMG/NCV of the bilateral lower extremities for neck pain, which was normal and without radiculopathy or neuropathy.  R. 611-12.  Dr. Botwin also noted, in part, Plaintiff's trigger points, muscle spasm, and limited range of motion of the cervical and lumbar spine. R. 611.

On October 28, 2009, Dr. Derasari noted his plan was to be "as conservative as possible" in treating Plaintiff's pain "while the [workers' compensation] decisions are being made."  R. 601.

When Plaintiff was re-examined by Dr. Webb on November 19, 2009, his EMG/NCV was noted to be negative and the CT myelogram identified a mild diffuse disc bulge at L4-5 with a superimposed broad based right foraminal and lateral broad based disc protrusion that indented the descending right L5 nerve root with no

significant central canal narrowing; mild diffuse disc bulge at L2-3 and significant

hypertrophic changes at L3-4 and L4-5.  R. 573-74.  However, trigger points, muscle

spasm, and limited range of motion were noted on examination in the lumbar and

cervical spine as well as numbness and tingling in the feet and hands, along with joint

pain and swelling.  No need for surgical intervention at this time was noted.  In

summary, Dr. Webb stated that Plaintiff has a "mild disc bulge at L4-5 which may be

putting pressure on the right L5 nerve root.  This does not correlate with his symptoms.

We thought he would have some pathology at L2-3, but the CT myelogram only showed

a mild disc bulge at this level.  His LE EMG was normal.  We told the patient to follow-

up with Dr. Botwin.  We are deferring work status and MMI to PM&R since no surgical

intervention is indicated at this time."  R. 574.

On December 11, 2009, Dr. Botwin noted, in part, several normal or negative

tests, but trigger points and decreased range of motion of the cervical and lumbar spine

were noted.  He opined that Plaintiff was unable to work and has a "permanent and total

disability."  R. 609.  It appears that this was Plaintiff's last visit with Dr. Botwin.

On December 23, 2009, Dr. Derasari noted the goal was to keep Plaintiff

functional with minimal side effects "because with his problem and pathology, we cannot

cure the pain, but certainly I would like him to take less narcotic as much as possible."

R. 604.

On January 25, 2010, Dr. Derasari noted Plaintiff continued to have knee pain,

and although injections were given three weeks prior, the pain control did not last,

although it was noted that "[t]he combination of Percocet with Soma helps and works,

and he also needs and takes Ambien at night.  With this he is able to do his activities of

daily living at home."  R. 605.  It appears that this was Plaintiff's last visit with

Dr. Derasari.

Except for Dr. Freeman's August 5, 2010, vocational testing report and

Dr. San Filippo's August 6, 2010, vocational analysis, there does not appear to be any

additional examination/treatment evaluations in the Record after January 25, 2010.

On July 21, 2010, Plaintiff's counsel requested Dr. Botwin's opinion regarding

Plaintiff's residual functional capacity.  R. 616.

On July 23, 2010, Dr. Botwin completed a two-page Physical Capacities

Evaluation.  R. 606-07, exhibit 22F.  He opined that Plaintiff was limited to sitting,

standing, and walking one hour or less during an 8-hour workday; could lift/carry up to

ten pounds occasionally; could not push or pull; could only occasionally bend up to "1 to

33%" of an 8-hour day; and never squat, kneel, crawl, or reach above shoulder level.

Dr. Botwin further stated that Plaintiff had a condition that met or equaled Listings 1.00

and 1.04 due to constant pain with impaired gait, strength, and range of motion.  *Id.*, at

607.

On July 30, 2010, in a letter provided by Plaintiff's counsel, Dr. Derasari stated he

agreed with Dr. Botwin's assessment of Plaintiff's physical limitations and also agreed

with his disability Listing of 1.04, but rendered no explanation for his agreement.

R. 619-20.

On August 5, 2010, Allen W. Freeman, M.S., CVE, CRC, provided a vocational

testing report and concluded, in part, that Plaintiff "could not read a complete sentence

by himself;" that "[h]e lacked any ability to read and comprehend sentences;" and that Plaintiff's math computation abilities were at the second grade level.  R. 315, 318.

On August 6, 2010, David San Filippo, Ph.D, provided a vocational analysis "by reviewing medical and vocational presented regarding" Plaintiff.  R. 319-20.  His analysis was based on Plaintiff's activities of daily living, vocational history, and the medical opinion of Dr. Botwin, and Dr. Derasari's agreement with Dr. Botwin.  Dr. San Filippo opined that Plaintiff is not capable of performing any of his past relevant work; does not have transferable skills to any other skilled or semi-skilled work; that his ability to perform sedentary unskilled work is negatively impacted by his restriction of sitting less than two hours in an eight hour day; and that he is also limited to less than sedentary lifting and carrying of objects.  Ultimately, Dr. San Filippo believed that Plaintiff "is vocationally disabled from any sedentary work that exists in the national, regional, and local economy."  R. 320.

**Analysis**

It is undisputed that Plaintiff suffered a significant injury to his cervical spine in 2003 as a result of a work-related experience.  In a prior case, it was determined that Plaintiff was disabled beginning on August 14, 2003, and ending on January 6, 2006, for which plaintiff was awarded benefits for a closed period of disability.  The Appeals Council denied Plaintiffs request for review of the closed period of disability determination.

In the case before this Court, Plaintiff alleges a disability beginning September 10, 2007, and it is the denial of disability benefits after September 10, 2007, which is the subject of this appeal.

Plaintiff argues that the ALJ erroneously rejected the opinions of Plaintiff's treating physicians, Drs. Kenneth Botwin and Manjul Derasari, erroneously rejected Plaintiff's credibility and subjective complaints of pain, and ultimately erred in not finding Plaintiff disabled and unable to work in the national economy.

Plaintiff has been evaluated by many health care professionals, including but not limited to treating physicians, Drs. Botwin and Derasari.  There are conflicts in the medical evidence, which are described and resolved by the ALJ, but not in Plaintiff's favor.

As noted by the ALJ, "[t]he evidence of record shows that [Plaintiff] is alleging disability mainly due to orthopedic related impairments."  R. 35.  The ALJ described Plaintiff's "severe impairments: a history of low back pain/lumbar degenerative disc disease; neck pain/history of cervical spinal stenosis, s/p diskectomy and fusion; bilateral knee pain; history of bilateral medical meniscus tear, s/p arthroscopic surgery on both knees and an adjustment disorder with depressed mood (20 CFR 404.1520(c))."  R. 27.  Plaintiff's long history of complaints of neck, lower back pain, and pain in both knees, both prior to and after surgery, are well documented as are his many examinations and efforts at treatment.

In November of 2008, Plaintiff was evaluated for the first time by pain management physician Dr. Derasari.  R. 409.  Plaintiff complained, in part, of pain running down his leg; numbness in his fingers and feet; he could not run, walk, or bend; he has been sleep deprived; and reported pain at 8/10.  R. 410.

Dr. Derasari began his HEENT examination notes with "[u]nremarkable," and

stated his evaluation:

> Neck: There is stiffness.  The patient has well healed scar of surgery anteriorly
> and posteriorly in the neck and his restriction of motion is there but there is no
> myofascial tenderness, no nerve root tenderness, no thyromegaly, and no neck
> vein distention.  Good strength in the upper extremity.  Lumbar spine, I do not
> find any specific trigger point or tenderness in the L4-L5 region, no tenderness in
> the sacroiliac region, no sciatic notch tenderness, no trochanteric tenderness.
> Hip rotation is unremarkable.  Knee jerks are 1+ on both sides.  Ankle is difficult
> to elicit.  The patient has good strength.  No calf tenderness.  No pedal edema.
> On the left posterior knee there is definite swelling which is not soft but
> somewhat firm but not hard, suggestive of popliteal cyst.  There is crepitus and
> restriction of movement and there is some hamstring tightness.  Bladder and
> bowels are voluntary.  R. 411.

R. 409-12, 416.  *See* p. 30, *supra*.

From December 16, 2008, until January 25, 2010, Plaintiff visited with

Dr. Derasari approximately 17 times, each time with similar complaints of pain.

Prescriptions for pain medications were filled and refilled.  The ALJ noted "there is little

in the way of any evaluations by Dr. Derasari outside of what is noted in the initial

evaluation." R. 35.

Also, "[b]ased on progress notes from Dr. Derasari and his primary care

physician, there is evidence that [Plaintiff] is getting multiple pain medications from

different providers for his alleged back, neck and knee pain (Ex. 21F/11)." R. 36.  On

several occasions Dr. Derasari cautioned Plaintiff regarding his overuse of drugs and

that he "needed better accountability."  *See, e.g.,* R. 445, 448, 593, 594-98.

In March 2009, Dr. Derasari assigned a 3% rating for Plaintiff's lower back for

workers' compensation purposes.  R. 440.  In April 2009, Dr. Derasari noted that the

orthopedist gave Plaintiff a 3% rating on his left knee and a 4% rating on the right knee.

From a low back perspective, Dr. Derasari gave him a 3% rating and Plaintiff was

limited to no frequent bending or lifting and carrying up to 20 pounds.  R. 448-50, 591.
In May 2009, Dr. Derasari noted that Plaintiff could lift/carry up to 20 pounds.  R. 450.
Plaintiff met with Dr. Derasari thereafter throughout 2009 and generally on a monthly
basis.

On January 25, 2010, Plaintiff met with Dr. Derasari for the last time and Plaintiff
continued to complain of knee pain, although apparently Plaintiff reported being able to
perform activities of daily living at home after taking a combination of Percocet with
Soma and Ambien at night.  R. 605.

On July 30, 2010, and in response to a letter provided by Plaintiff's counsel,
Dr. Derasari, without a follow-up examination with Plaintiff, agreed with Dr. Botwin's
assessment of Plaintiff's physical limitations and also agreed with his disability Listing of
1.04, but rendered no explanation for his agreement.  R. 619-20.

On September 14, 2009, Dr. Botwin evaluated (consultation for neck pain, R. 35)
Plaintiff for the first time at Dr. Webb's request.  R. 613.  The examination was
essentially normal (normal gait, station, and posture; motor strength 5/5 throughout
lower extremity) except for trigger points, muscle spasm, and limited range of motion.
R. 614.  Dr. Botwin's diagnosis was displacement of the lumbar intervertebral disc
without myelopathy; thoracic or lumbosacral neuritis; or radiculitis; spinal stenosis of the
lumbar region; degeneration of the lumbar or lumbosacral intervertebral disc; muscle
spasm; s/p cervical fusion anterior and posterior fusion; spinal enthesopathy; and
postprocedural arthrodesis status.

Dr. Botwin recommended a lumbar contour LSO back brace as well as a TENS
unit.  He further opined Plaintiff was unable to work.  Dr. Botwin noted that Plaintiff was

seeking a new pain management physician instead of Dr. Derasari, as he was not being provided with spinal injections or any therapy for his back surgery, and was recommending such procedures.  R. 615.

On September 16, 2009, Plaintiff had a follow-up visit with Dr. Botwin for a EMG/NCV of the bilateral lower extremities for neck pain, which was normal and without radiculopathy or neuropathy.  R. 611-12.  Dr. Botwin also noted, in part, Plaintiff's trigger points, muscle spasm, and limited range of motion of the cervical and lumbar spine. R. 611.

On December 11, 2009, Plaintiff had his final visit with Dr. Botwin who noted, in part, several normal or negative tests, but noted trigger points and decreased range of motion of the cervical and lumbar spine.  He opined that Plaintiff was unable to work and had a "permanent and total disability."  R. 609.

On July 23, 2010, at the request of Plaintiff's counsel, Dr. Botwin completed a two-page Physical Capacities Evaluation.  R. 606-07; *see* p. 37, *supra*, for the specific conclusions reached by Dr. Botwin.  Dr. Botwin did not perform any follow-up examination of Plaintiff (since their last visit on December 11, 2009) in order to render this opinion.

After noting case law that accords special weight to the opinions of treating physicians, the ALJ did not attach controlling weight to the conclusions reached by Drs. Botwin and Derasari about Plaintiff's "physical limitations because their extreme functional limitations are not supported by credible objective findings on the most recent MRI, CT myelogram and nerve conduction studies nor the other prior diagnostic studies done prior to 2009."  The ALJ noted that both Drs. Botwin and Derasari's "limitations are

inconsistent with their own progress notes, the results of the above imaging and other diagnostic studies any other contrary opinions offered in the record.  Furthermore, both opinions are quite conclusory, providing very little explanation of the evidence relied on informing each such opinion.  The evidence of record shows that [Plaintiff] has only been assigned a 3% impairment rating to his left knee, a 4% impairment rating to his left [sic] knee and a 3% impairment rating to his lower back, which do not support such extreme functional limitations.  Furthermore, Dr. Derasari has done little more than prescribe numerous narcotics for [Plaintiff] and has done no physical exams in well over two years or more and Dr. Botwin only saw [Plaintiff] on three separate occasions beginning on September 14, 2009."  R. 36-37.

No treating physician, including Dr. Cromer, his primary care physician, who Plaintiff saw during the last couple of months prior to the hearing, R. 94-95, testified during the evidentiary hearing.  Plaintiff relied extensively on his medical records to support his claim, but offered no affirmative testimony during the hearing, other than his own testimony and some supporting testimony during cross-examination of the witnesses who testified, to support the cryptic conclusions reached by Drs. Botwin and Derasari regarding the severity of Plaintiff's disability and inability to work.

The ALJ attached greater weight to the opinions of Dr. Hancock, a non-treating independent medical consultant, who testified during the evidentiary hearing.  R. 37.

When reduced to its essence, resolution of this case turns on the weight to be given to Dr. Botwin's opinion in so far as he opined that Plaintiff is disabled and cannot work.

The ALJ concluded that Plaintiff "is unable to perform any past relevant work. R. 37.  The ALJ also determined that Plaintiff's ability to perform all or substantially all of the requirements of a full range of light work "has been impeded by additional limitations." R. 38.

The ALJ discussed the testimony of the vocational expert, Mr. Bradley, who testified essentially that Plaintiff could perform the requirements of representative light unskilled work such as a ticket taker, a dining room attendant, a housekeeper, or a laundry press operator.  R. 38.  Mr. Bradley's opinion was rendered after considering a hypothetical question from the ALJ.  R. 116-18. The ALJ concluded that given Plaintiff's "age, education [which is severely limited], work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." R. 37-38.

However, Mr. Bradley, when asked a hypothetical question by Plaintiff's counsel that adopted the opinion of Dr. Botwin, agreed that Plaintiff would not have the ability to perform any other jobs in the national economy, including such jobs as ticket taker, *etc.*, mentioned above.  R. 120-21.  On this point, this portion of Mr. Bradley's opinion is consistent with Dr. San Filippo's opinion that Plaintiff cannot work.

The ALJ ultimately determined that Plaintiff's proof of disability, including Plaintiff's testimony regarding his pain, such that he could not perform any limited work, was lacking.  Stated otherwise, the ALJ concluded that Plaintiff did not adequately rebut the Commissioner's showing.  Hale, 831 F.2d at 1011.

The ALJ's conclusions regarding the weight to be given to the treating physicians, in particular Drs. Botwin and Derasari, are supported by substantial evidence, having correctly applied the appropriate legal standards.  The ALJ's weight given to the Plaintiff's subjective complaints of pain as well as Plaintiff's limited education, as they relate to his claim of disability and inability to work, is supported by substantial evidence and in accordance with controlling law.  The ALJ did not err in reaching these conclusions.  Also, the ALJ properly resolved any conflicts in the evidence relating to the limited type of work that Plaintiff may pursue and the ALJs findings are supported by substantial evidence.

**Conclusion**

Considering the record as a whole, the findings of the ALJ were based upon substantial evidence in the record and the ALJ correctly followed the law.

Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is DIRECTED to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on May 1, 2012.


**s/    Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**